897 A.2d 904

DEPARTMENT OF HUMAN RESOURCES, Anne Arundel County Department of Social Services

v.

Sherri HOWARD.

No. 2099, Sept. Term, 2004.

Court of Special Appeals of Maryland.

May 18, 2006.

622

Sandra Barnes (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Ilona McClintick, Baltimore, for appellee.

Panel: MURPHY, C.J., DAVIS, HOLLANDER, SALMON, JAMES R. EYLER, KENNEY, DEBORAH S. EYLER, ADKINS, KRAUSER, BARBERA, SHARER, MEREDITH, WOODWARD, CHARLES E. MOYLAN, JR. (Retired, specially assigned), and RAYMOND J. THIEME, JR., (Retired, specially assigned), JJ.

MURPHY, C.J.

This appeal from the Circuit Court for Anne Arundel County presents the question of whether an administrative finding that the mother of a 13-year old boy committed an act of "indicated child abuse" is "appropriate" based upon factual findings that the mother (1) decided to impose corporal punishment on her son in response to his disrespectful behavior towards her, (2) intended to strike the back of her son's head with her knuckles, as she was looking at the back of his head when she moved her hand towards him, and (3) caused an injury to her son's eye when he suddenly turned his head and was therefore struck in the face. For the reasons that follow,

we hold that the answer to this question is "no," and we shall therefore affirm the judgment of the circuit court.

## Factual Background

The parties to this appeal are the Anne Arundel County Department of Social Services, appellant (the Department), and Sherri Howard, appellee, who was deemed by the Department to have been responsible for "indicated child abuse" as a result of having struck her then 13–year old son, Alexander, with sufficient force to leave a two-inch by one-inch bruise about his eye. When Alexander showed up at school on April 3, 2003 with a bruised and swollen left eye, he was sent to the school nurse, who placed ice on the swollen eye. Appellee was called to the school, where she explained to school authorities that she had hit Alexander with her hand the day before because he had "gotten out of hand." The case of possible abuse came to the attention of the Department of Social Services on April 4, 2003, when the Department received a report of possible child abuse from Alexander's school.

The Department assigned a licensed social worker (LSW) to investigate the incident, and on the afternoon of April 4, she interviewed Alexander at his home. She observed a two-inch bluish black bruise on his left eyelid. Alexander explained that his mother "accidentally" hit him with her knuckles when he was "back talking." The LSW also spoke with two of Alexander's siblings: 1) Norweice, age 11; and 2) Treyvon, age 9. Both of them, as well as Alexander, stated that appellee sometimes punished them by hitting them with a belt "the same number of times as their age." All three children said that they were sometimes afraid of appellee because they "don't want to be hit."

The LSW also interviewed appellee, who explained that Alexander was on Ritalin and was in therapy. Appellee stated that she was doing everything she could to help him behave better, but that she would get a call from the school almost on a daily basis complaining about his behavior. According to appellee, on April 2 she attempted to hit Alexander in the back of his head with her knuckles because he was being

"smart," but that she "got him in the eye" by accident when he unexpectedly turned his head.

## Procedural History

On June 4, the Department advised appellee of its finding that, because of the April 2 incident, she was responsible for "indicated abuse." Appellee requested a contested case hearing before the Office of Administrative Hearings. A contested case hearing was held on January 20, 2004, before an Administrative Law Judge (ALJ). During the hearing, the LSW testified for the Department, and appellee testified for herself. In an eight page Decision filed on February 27, 2004, the ALJ affirmed the decision of the Department that there was "indicated child abuse" and that appellee should be identified in the central registry as the abuser.

The ALJ's opinion included the following findings and conclusions:

> Maryland law provides that the Department of Human Resources may identify an individual as responsible for child abuse or child neglect in a central registry if the person has unsuccessfully appealed the entry of his or her name under procedures established by the Department. Md.Code Ann., Fam. Law § 5–714(e) (Supp.2003). If an appellant is found to be responsible for "indicated" child abuse or neglect, the local department must "identify" the name of the appellant in a central registry by "entering a marker, code, flag, or symbol next to the name of an individual ... to make clear that the individual has been determined ... to be responsible for indicated child abuse or neglect." COMAR 07.02.26.02B(12); COMAR 07.02.26.14C.

> If an individual is found to be responsible for "unsubstantiated" child abuse or neglect, the local department may include the name of the appellant in the central registry as part of the "identifying information" related to the investigation of the case. Md.Code Ann., Fam. Law § 5–714(d); see also Md.Code Ann., Fam. Law § 5–701(i); COMAR 07.02.26.02(13)(d).

In "ruled out" cases, the central registry may not contain any "identifying information" related to an investigation of abuse or neglect and the local department must expunge the finding and identification from reports of suspected abuse/neglect and from all assessments and investigative findings. Md.Code Ann., Fam. Law §§ 5–714(d)(2)(i), 5–707(b)(2).

. . . .

In the instant case, the four elements of indicated physical abuse have been met. [The LSW] observed a sizable bruise on Alexander's left eyelid when she interviewed him on April 4, 2003. Alexander told [the LSW] that the Appellant accidentally hit him with her knuckles. When interviewed by [the LSW], the Appellant stated Alexander was getting "smart" with her, so she went to hit him in the head. However, her knuckles caught his eye. At the hearing the Appellant repeated her explanation, but stated that she did not mean to injure or harm Alexander. It was her belief that she was not disciplining Alexander and the Appellant termed the incident a "true accident." On cross-examination, the appellant described the incident as "one of the few times it was not a hostile situation between us."

The Appellant is Alexander's mother. Alexander was thirteen years old at the time of the incident. There is no disagreement as to the events on April 2, 2003. The arguments of the parties revolve around whether the incident meets the statutory regulatory definitions of indicated physical abuse, specifically whether Alexander's health and welfare were harmed or at substantial risk of harm due to the Appellant's actions on April 2, 2003.

The Appellant's counsel argues that AADSS equates physical discipline with physical abuse. She contends that physical discipline is appropriate and legal. Counsel relies on COMAR 07.02.07.12C(2)(a)(i) which holds that physical abuse may be ruled out if "[t]he act causing the injury was accidental or unintentional and not reckless or deliberate." When the Appellant went to hit Alexander on the side of his head, he turned his head and was mistakenly hit in the eye,

causing the bruise. Therefore the act should properly be deemed an accident. The Appellant had no intent to hit Alexander in the eye and no intent to inflict serious injury. In counsel's view, the local department's charges are disingenuous because they never took the child to the doctor, demonstrating that they were not really concerned with the child's health or welfare.

I believe counsel's argument misses the point. These are not criminal charges that I am adjudicating here. Nowhere in the applicable law or regulations is intent a necessary element to sustain a finding of indicated child abuse. Further, because Alexander had a two by one inch bruise on his left eyelid that persisted for several days, I conclude he was harmed by the Appellant's actions. Even more compelling is the unavoidable conclusion that Alexander's health and welfare were at substantial risk of harm because of the potential that the Appellant's blow could have injured Alexander's eye even more severely, causing his retina to become detached, his cornea scratched, or even causing permanent impairment to his vision. Anytime a blow is directed to a child's head, permanent brain damage is also a possibility.

There is no question that the Appellant intended to hit Alexander in the head in order to stop his rude behavior. By her own admission, hitting him was a deliberate action and not an accident. The fact that he turned his head and the Appellant missed her intended target does not alter her action and make it accidental or unintentional as contemplated by COMAR 07.02.07.12C(2)(a)(i).

There was a great deal of testimony and evidence relating to allegations about events which occurred subsequent to the April 2, 2003 incident and the immediate following investigation. That information is not relevant to my conclusions in this case. Therefore, I have not included or discussed that information in this decision, because *the only issues before me are whether the finding of indicated child abuse which resulted from the April 2, 2003 incident was*

*correct, and whether the Appellant was properly identified as the person responsible for the indicated child abuse.*

## CONCLUSIONS OF LAW

Based upon the above Findings of Fact and Discussion, I conclude as a matter of law that the local department has established by a preponderance of the evidence that the finding of indicated child abuse is supported by credible evidence and is consistent with the law. Md.Code Ann., Fam. Law § 5-701(b); COMAR 07.02.07.12; COMAR 07.02.26.14. I further conclude that the local department has established by a preponderance of the evidence that the Appellant is an individual responsible for indicated child abuse. COMAR 07.02.07.10.

I further conclude, as a matter of law, that the local department may identify the Appellant in a central registry as an individual responsible for indicated child abuse. Md. Code Ann., Fam. Law § 5-714(e)(1)(ii)1. COMAR 07.02.26.02B(12); COMAR 07.02.26.14C.

(Emphasis added).

Appellee petitioned for judicial review, and the circuit court found in her favor in an on-the-record oral opinion that included the following findings and conclusions:

The test that we deal with is whether the nature, extent and location of the injury indicate that the child's health or welfare was harmed or was at substantial risk of harm. That is the definition of abuse in the COMAR regulations.

And so, a lot of the discussion today and in the briefs has to do with whether or not the definition is important in terms of whether this was corporal punishment or whether it wasn't corporal punishment, and I fail to see that a person, in this case the petitioner, that her definition should definition [sic]; that if I say it is corporal punishment when I hit my son, then that makes it corporal punishment. And if I say it is not, that that some how makes it something different.

I think the ALJ—Ms. Barnes disagrees with me, but the ALJ I think came to the conclusion that this was a form. Not perhaps a satisfactory form, but a form of corporal punishment because there was a physical act intended for the purposes of changing the behavior pattern or at least the incident behavior of the child.

And the fact that it was reflexive simply, I think, makes a difference in terms of whether there was a spank on the bottom or a rap on the head or some other form. But I don't think that that takes this case outside of the analysis in the *Vann* case, and I think it is a world of difference between this case and the *Vann* case.

In the *Vann* case the ALJ's conclusion that was affirmed by the Court of Special Appeals was, "The substantial risk and potential for harm was imminent, in that if the child had ducked to avoid the belt, the buckle could have struck his eye or teeth and could have resulted in more serious even permanent injuries. Once an intended target becomes a moving one, it cannot be predicted with certainty where the blows will land."

So what we have there is dad trying to punish the child with a belt that had a big belt buckle on it, and the child was struggling and running and grabbing the belt and so forth, and the persistent [sic] of the father in persisting to punish him in that way was deemed to be inherently risky.

In our case what we have is a relatively innocuous act by the petitioner where she was trying to pop—I think was her description and as the ALJ described it. By anatomical reference she was trying to hit him on the back of the head with a knuckle. The back of her hand.

And unfortunately, as that was happening the child turned his head and an untoward and unpredictable result. Now, is it physically predictable that something like that could happen? Certainly. Is it reasonable [sic] predictable that if I try to rap somebody on the back of the head he may turn and at that very instant I am going to poke him in the eye? I don't think that that necessarily flows from that.

The ALJ, from reading the opinion, comes to a conclusion that I think really fails to give any recognition to the fact that the result was not the sort of logical outcome of the act. Different, I think, substantially from the *Vann* case.

. . . .

[The ALJ] says that the unavoidable conclusion that Alexander's health and welfare were at substantial risk of harm because of the potential that the appellant's blow could have injured Alexander's eye even more severely causing his retina to become detached, his cornea scratched or even causing permanent impairment to his vision; any time a blow is directed to a child's head, permanent brain damage is also a possibility.

That, to me, is just an extraordinarily over-broad conclusion reached from facts that the record simply does not support, and I do acknowledge that there has to be deference to the fact finding because this is not a pure application of law, but is a blend of applying law to the facts. But I candidly, with all due respect to the ALJ, do not see how a reasonable fact finder could have reached the conclusion that she did, and accordingly, I am going to reverse the order. . . .

This appeal followed, in which the Department argues that this Court must "uphold the administrative decision, where, as here, a reasonable person could reasonably have concluded that the alleged behavior occurred, and that it satisfied the definition of 'indicated child abuse.' " (Citing *Charles County Dept. of Social Services v. Vann*, 382 Md. 286, 298–99, 855 A.2d 313 (2004)). According to appellant, "when, as here, a parent deliberately strikes her child, and the child both sustains injury and is harmed or placed at substantial risk of harm, the law provides for a finding of 'indicated child abuse' and permits the local department to retain its confidential records relating to its investigation." *See* Md.Code (2004 Repl.Vol.), Fam. Law (F.L.) §§ 5–701(b), 5–706(c), 5–707, 5–714.

## Standard of Review

■ Judicial review of the administrative agency decision at issue in this appeal is authorized by Maryland Code (1984, 1999 Repl.Vol.), § 10–222 of the State Government Article.[1] Judicial review of an administrative agency's decision differs from appellate review of a judgment entered by a trial court.[2]

---

1. Under subsection (h), when exercising such review, the court may:
   (1) remand the case for further proceedings;
   (2) affirm the final decision; or
   (3) reverse or modify the decision of any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:
      (i) is unconstitutional;
      (ii) exceeds the statutory authority or jurisdiction of the final decision maker;
      (iii) results from an unlawful procedure;
      (iv) is affected by any other error or law;
      (v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or
      (vi) is arbitrary or capricious.

2. Our role in reviewing an administrative agency decision is precisely the same as that of the circuit court. *Department of Health and Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–04, 641 A.2d 899 (1994). Judicial review of agency action has been described as "narrow." *United Parcel Serv. v. People's Counsel for Baltimore County*, 336 Md. 569, 576, 650 A.2d 226 (1994). Review is generally restricted to the evidence developed before the agency, although in some circumstances the circuit court may receive additional evidence of arbitrary or capricious action. *Ad + Soil, Inc. v. County Commissioner's*, 307 Md. 307, 321, 513 A.2d 893 (1986).

   Our review of an agency's fact finding does not permit us to engage in an independent analysis of the evidence. *Anderson v. Department of Pub. Safety & Correctional Servs.*, 330 Md. 187, 212, 623 A.2d 198 (1993). Under no circumstances may we substitute our judgment of that of the agency. *Anderson*, 330 Md. at 212, 623 A.2d 198. "That is to say, a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency...." *Baltimore Lutheran High Sch. v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985); *Anderson*, 330 Md. at 212, 623 A.2d 198; *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 511–13, 390 A.2d 1119 (1978); *Moseman*, 99 Md.App. at 262, 636 A.2d 499. In this context, " 'substantial evidence,' as the test for reviewing factual findings of administrative agencies, has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]' " *Bulluck*, 283 Md. at 512, 390 A.2d 1119 (quoting *Snowden v. Mayor of Baltimore*, 224 Md. 443, 448,

While the appellate court can affirm the judgment of the trial court for a reason that is supported by the record, even if that reason was not relied upon by the trial court, in judicial review of an agency's decision, the reviewing court cannot uphold the agency's decision unless that decision is sustainable for the reasons stated by the agency. *United Steelworkers of America v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62 (1984).

In the case at bar, we accept all of the Administrative Law Judge's first level factual findings.[3] Having done so, we must next "determine if the administrative decision is premised upon an erroneous conclusion of law." *Aviation Administration v. Noland*, 386 Md. 556, 574 n. 3, 873 A.2d 1145 (2005) (quoting *United Parcel v. People's Counsel*, 336 Md. 569, 577, 650 A.2d 226 (1994) "and cases there cited.") For the reasons that follow, we conclude that the facts found by the ALJ do not support the conclusion of law that appellee committed an act of "indicated child abuse."

### Maryland's Other "Child Abuse" Statutes

Although the case at bar involves § 5–701 of the Family Law Article and COMAR regulation 07.02.07.12, which was promulgated pursuant to that statute, the regulation expressly provides that there are cases in which a finding of "ruled out" child abuse is "appropriate" even if the child suffered an injury. COMAR 07.02.07.12(C). Because a finding of "ruled out" child abuse may be "appropriate" when a child suffers an unintended injury as a result of corporal punishment, the following statutes are relevant to the issue of whether the

---

168 A.2d 390 (1961)). We are also obligated to view "the agency's decision in the light most favorable to the agency, "since its decisions are *prima facie* correct and carry with them the presumption of validity." *Anderson*, 330 Md. at 213, 623 A.2d 198; *Bulluck*, 283 Md. at 513, 390 A.2d 1119.

**3.** Although the ALJ never expressly announced a finding that appellee intended to hit her son on the back of the head, a finding that appellee intended to strike any other portion of the head would be clearly erroneous.

ALJ's factual findings support the conclusion that appellee's conduct constituted "indicated" child abuse.

Maryland Code (2002), § 3–601 of the Criminal Law article ("C.L."), in pertinent part, provides:

(a) Definitions.—

(1) In this section the following words have the meanings indicated.

(2) "Abuse" means physical injury sustained by a minor as a result of cruel or inhumane treatment or as a result of malicious act under circumstances that indicate that the minor's health or welfare is harmed or threatened by the treatment or act.

▪ In order to obtain a conviction, the State must prove "that the defendant caused physical injury as a result of cruel or inhumane treatment [or a malicious act]; and ..., as a result, the [victim's] health or welfare was harmed or threatened." MPJI–Cr 4:07. As the **Comment** to the Micpel instruction points out, "[i]mplicit in the concept of cruel or inhumane treatment or a malicious act is the incorporation of the common law rule permitting a moderate, reasonable, or appropriate amount of force for the purpose of discipline, considering the age, condition, and disposition of the child, plus other surrounding circumstances." MPJI–Cr 4:07 at pp. 162–63 (1995 ed.).

In a child abuse case, by virtue of its application only to those in *loco parentis, see Pope v. State, supra* [284 Md. 309, 396 A.2d 1054 (1979) ], an accused begins with a permissible degree of corporal punishment of a child for which he or she as a parent figure cannot be held accountable. Beyond that even, the person is not guilty if his intentions were good, but his judgment bad, in exercising his right to punish.

*Worthen v. State,* 42 Md.App. 20, 40, 399 A.2d 272 (1979). *See also* D. Aaronson, *Maryland Criminal Jury Instructions and Commentary* (2d ed.) § 4.58 at pp 503–05.

Section 4–501 of the Family Law Article, in pertinent part, provides:

(a) In general.—In this subtitle the following words have the meanings indicated.

(b) Abuse.—(1) "Abuse" means any of the following acts:

　(i) an act that causes serious bodily harm;

　(ii) an act that places a person eligible for relief in fear of imminent serious bodily harm;

　(iii) assault in any degree;

　(iv) rape or sexual offense as defined by Article 27, §§ 462 through 464 C of the Code or attempted rape or sexual offense in any degree;  or

　(v) false imprisonment.

(2) **If the person for whom relief is sought is a child, "abuse" may also include abuse of a child, as defined in Title 5, Subtitle 7 of this article.  Nothing in this subtitle shall be construed to prohibit reasonable punishment, including reasonable corporal punishment, in light of the age and condition of the child, from being performed by a parent or stepparent of the child.**

(Emphasis added).  Although § 4–501 is directly applicable to situations in which a protective remedy is being sought on behalf of a child, the language of this statute cannot be ignored.[4]  The Maryland General Assembly has expressly codified the parent's common law right to impose "reasonable corporal punishment, in light of the age and condition of the child."

---

4. Section 4–501(b) is located within the Domestic Violence Statute of Maryland's Family Law article.  In *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 775 A.2d 1249 (2001), the Court of Appeals stated:

　"The purpose of the domestic abuse statute is to protect and 'aid victims of domestic abuse by providing an immediate and effective' remedy.  The Statute provides for a wide variety and scope of available remedies designed to separate the parties and avoid future abuse.  Thus, the primary goals of the statute are preventive, protective and remedial, not punitive."

　*Katsenelenbogen*, 365 Md. at 134, 775 A.2d 1249 (quoting *Barbee v. Barbee*, 311 Md. 620, 623, 537 A.2d 224 (1988)).

## The Statute and Regulation at Issue

Family Law § 5–701, in pertinent part, provides:

(b) "Abuse" means:(1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed. . . .

COMAR regulation 07.02.07.12, which was promulgated pursuant to § 5–701, provides the following guidelines for determining whether a "finding" of abuse is or is not "appropriate" in a particular case:

A.   Indicated Child Abuse.

(1) . . . a finding of indicated child physical abuse is appropriate if there is credible evidence, which has not been satisfactorily refuted, that the following four elements are present:

(a) A current or prior physical injury;

(b) The injury was caused by a parent, caretaker, or household or family member;

(c) The alleged victim was a child at the time of the incident; and

(d) The nature, extent, and location of the injury indicate that the child's health or welfare was harmed or was at substantial risk of harm.

B.   Unsubstantiated Child Abuse.   A finding of unsubstantiated child abuse is appropriate when there is insufficient evidence to support a finding of indicated or ruled out child abuse.   A finding of unsubstantiated may be based, but is not required to be based, on the following:

(1) Insufficient evidence of a physical or mental injury, . . .

(2) Insufficient evidence that the individual alleged to be responsible for the child abuse was a parent, caretaker, or household or family member;

(3) The lack of a credible account by the suspected victim or a witness;

(4) Insufficient evidence that the child's health or welfare was harmed or was at substantial risk of being harmed . . .

C. Ruled Out Child Abuse. A finding of ruled out child abuse is appropriate if child abuse did not occur. A finding of ruled out may be based on credible evidence that:

(1) There was no physical or mental injury or, . . .

(2) In the case of physical abuse:

(a) The alleged abuser was not responsible for the injury for reasons including, but not limited to, one of the following:

(i) The act causing the injury was accidental or unintentional and not reckless or deliberate; or . . .

(b) The child's health or welfare was not harmed or at substantial risk of being harmed; . . .

Code of Maryland Regulations, Tit. 07 § .02.07.12(2005).

### The *Vann* Case

In *Vann, supra,* the Court of Appeals was presented with the following operative facts:

On May 6, 1999, Charles Vann, respondent, and his wife each received a phone call from the administrators of the daycare center of their six-year-old son. The daycare providers had called to advise them that their son had brutally punched and kicked a teacher in the stomach. Because the teacher was thought to be pregnant and had suffered serious injuries, the daycare providers sent her to the hospital and demanded that respondent and his wife immediately retrieve their son from the daycare center.

That evening, respondent and his wife discussed the situation. This was not the first time their son had misbehaved violently at the daycare center. Prior to this incident, he had been involved in multiple bouts of fighting with the other students, prompting the providers to transfer him from his original classroom to a new one and, on occasion, to send him home early. Ultimately, the difficulties with the child became so severe that the daycare providers threat-

ened to, and eventually did, expel him permanently from the center.

Respondent and his wife were consternated by their six-year-old's repeated and unrelenting behavioral issues. Previous attempts to modify the child's conduct using a graduated discipline regimen—which included sitting him in a corner for fifteen minutes, banning him from access to his video games, prohibiting him from going outside to play with his friends, and restricting his movements to his bedroom—had resulted only in more clashes with the students and teachers, culminating in the punching incident on May 6.

Both parents agreed that corporal punishment was the appropriate discipline for their son's misbehavior that day. Using his personal belt, respondent, while verbally chastising his son for the incident at the daycare center, struck at his son. But the six-year-old attempted to avoid the blows by running away, hiding under the bed, and grabbing the belt from his father. In the course of the tussle and respondent's attempts to land the blows, respondent struck him in his lower back with the belt buckle, causing a reddish, moon-shaped bruise about an inch in length. In all, respondent struck his son two or three times with the belt.

The following day, respondent's son complained to his teacher of back pain. The daycare providers observed the injuries on the child and reported the matter to Child Protective Services. Eventually, an investigator employed by the local Department of Social Services was called to look into the matter. On May 10, 1999, the investigator interviewed respondent and his wife. On January 13, 2000, the local department advised respondent that he had been charged with indicated child abuse, *see* FL §§§§ 5–701(b)(1) and 5–701(m); that his name would be submitted to a state centralized registry used for the recording of such findings, *see* FL §§ 5–714(e); and that he had a right to contest the charge before an administrative court, *see* FL §§ 5–706.1. *See also Montgomery County v. L.D.,* 349 Md. 239, 707 A.2d 1331 (1998); *C.S. v. Prince George's County Dept. of Social*

*Services,* 343 Md. 14, 680 A.2d 470 (1996). (footnotes omitted.)

*Vann,* 382 Md. at 289–91, 855 A.2d 313.

Based upon this factual background, the Court of Appeals concluded that "a reasoning mind could have reached the conclusion, based on this record, that [Mr. Vann's] actions created a substantial risk of harm toward his son," explaining:

> . . . this Court must assess whether a reasoning mind could have reached the conclusion, based upon this record, that respondent's actions created a substantial risk of harm toward his son. The ALJ's considered judgment was that the swinging of the buckle end of a belt at a six-year old who was attempting to run away *did* create such a risk. The record substantiates this finding, and it was not unreasonable. Furthermore, the record establishes that respondent admitted causing the bruise injuries to his son's lower back; that respondent's wife saw the reddish bruise marks herself after the corporal punishment; that respondent continued to swing the belt at the child in spite of the child's frantically running around the room; and that respondent "missed the mark" of his son's buttocks, hitting instead the lower back with a metal buckle swung at a six-year-old child. The ALJ found that there existed a danger of the belt striking the eyes and teeth as well as an unacceptable level of uncertainty in terms of the potential for serious injury that is inherent in the swinging of a belt buckle at a moving target. These concerns were also not unreasonable, and the record supports these findings.

*Vann,* 382 Md. at 299–300, 855 A.2d 313.

### The *Taylor* Case

In *Taylor v. Harford County Dept. of Social Services,* 384 Md. 213, 862 A.2d 1026 (2004), which was decided *after* the ruling of the circuit court in the case at bar, the Court of Appeals rejected the proposition that "any random act by a parent could be called child abuse if a child were inadvertently

injured." *Id.* at 231, 862 A.2d 1026. The *Taylor* opinion was based upon the following operative facts:

On the afternoon of November 10, 2002, while appellant was attempting to take a nap on a couch in his home, "L" approached him and asked him to help her with a problem she was having with a computer. Appellant told "L" that she would have to wait until after he had finished his nap. While he was still in the midst of his nap, "L" for a second time approached him about fixing the computer problem. Appellant once again told her that she would have to wait, admitting that this time he "raised his voice and yelled at her." Later that afternoon, apparently unwilling to wait further, "L" woke appellant for a third time, once more asking him for his help. Appellant, who had by this time grown irritated at his daughter, got up from the couch and told her that she would have to wait until he finished his nap. While telling "L" this, "to accent his point," appellant kicked a footstool that was in front of the couch. He had intended to kick the footstool into the couch but instead the kick propelled the footstool over the couch and into the air, where it eventually collided with his daughter, who happened to be standing behind the couch. The footstool hit "L" in the face, causing her nose to bleed and her jaw to be sore. (footnotes omitted.)

*Taylor,* 384 Md. at 216–17, 862 A.2d 1026.

Based on these facts, the Court vacated and remanded the case for re-examination of the finding of indicated child abuse. Judge Cathell, writing for the Court, stated:

The threshold question ... in a case such as this is whether the act causing injury to a child was done with an intent to injure or was done recklessly and injury resulted. In the case *sub judice,* intent is relevant only insofar as determining whether there was an intent actually to injure the child. Therefore, by solely invoking a foreseeability of harm test, a concept inextricably tied to a general negligence analysis, in deciding whether [appellee] HCDSS's finding of indicated child physical abuse was appropriate, the ALJ applied an improper standard to the facts before him.

\* \* \*

... if we were to abide by the methodology by which the ALJ interpreted § 5–701 ... and the pertinent COMAR regulations, it appears that *any* intentional act by a parent or caretaker which has the unintentional consequence of harming that person's child would amount to child abuse, and result in the parent being placed on the central registry of individuals responsible for child abuse, basically creating a strict liability standard for parents or caretakers, who unintentionally injure their children.... We doubt that either § 5–701 of the Family Law Article or COMAR 07.02.07.12 intends for such a draconian strict liability standard always to attach to the intentional acts of parents or caretakers who unintentionally injure their children.

*Part of the blame may lie with the unfortunate wording of COMAR 07.02.07.12C(2)(a)(i) in that most acts, whether or not they have unintended consequences, are intentional.* For instance, if someone pushes a door open without realizing someone is just on the other side, and then the door slams that other person in the face, the act of opening the door cannot be said to have been either accidental or unintentional, although the injurious consequences of that act may have been just that. Under the ALJ's use of "foreseeability," if an act occurs that results in injury to a child that injury would be foreseeable because the injury occurred. Another example would be those instances where drivers have run over other persons as they operated vehicles in reverse. The foreseeability of the drivers's actions would be very relevant in a negligence tort context even though there was no intent to injure. However, under the ALJ's analysis, if the driver was a parent and the person injured his or her child, the foreseeability standard of negligence would be transmogrified into intent to injure the child and the parent would forever be branded a child abuser. We do not believe that was the intent of the Legislature.

We hold that, under the circumstances here present, *the intentional act must be shown to have been either reckless*

*in its nature or deliberately intended to harm the child in order for a finding of "indicated child abuse" to be made. . . .* In respect to intent, *it is material* whether there was "intent" to injure "L." *There was no direct evidence proffered, other than the act of kicking the footstool, that contradicted the evidence proffered by appellant that he did not intend to injure his daughter. The correct standard therefore was unrelated to intent to injure, but whether appellant's actions were "reckless."* . . . (Emphasis added.)

*Taylor,* 384 Md. at 230–33, 862 A.2d 1026.

### The Case at Bar

We are persuaded that the following principles have been established by the statutes, regulations, and cases set forth above:

1. The Maryland General Assembly has expressly codified the parent's common law right to impose "reasonable corporal punishment, in light of the age and condition of the child."

2. A finding of "indicated child abuse" is not "appropriate" when the evidence establishes that the child's parent imposed corporal punishment that left the child with an injury *unless* "[t]he nature, extent, and location of the injury indicate that the child's health or welfare was harmed or was at substantial risk of harm."

3. Under COMAR 07.02.07.12(C), a finding of "ruled out child abuse" would be "appropriate" even though an observable injury has resulted from corporal punishment that was intentionally imposed. This regulation expressly requires the consideration of other "reasons," such as (1) the reasonableness of the alleged abuser's expectation that no injury would result from the punishment, (2) the fact that the child's injury did not require medical treatment, and (3) the lack of expert testimony on the issue of whether the observable injury caused either "harm" or "substantial risk of harm" to the child's "health or welfare."

4. A finding of "indicated child abuse" may be "appropriate" when the evidence establishes that the child's parent imposed corporal punishment that left the child with an injury "[t]he nature, extent, and location of [which] indicate that the child's health or welfare was harmed or was at substantial risk of harm."

(a) *Taylor, supra,* makes it clear that an "indicated" finding is certainly appropriate when the parent intended to cause such an injury.

(b) *Vann, supra,* makes it clear that an "indicated" finding is also appropriate when, even though the parent did not intend to cause such an injury, the parent imposed corporal punishment under circumstances in which it is *likely* that such an injury would result from the punishment imposed.[5]

(c) *Taylor, supra,* also makes it clear that an "indicated" finding is appropriate when, even though the parent did not intend to cause such an injury, the parent imposed corporal punishment with reckless indifference to the

---

5. The *Vann* Court quoted with approval from the dissenting opinion that Judge Deborah Eyler filed when a divided panel of this Court held that Mr. Vann had not committed an act of "indicated child abuse" because "[a] spanking that would not constitute 'indicated child abuse' if the child obeys the parent's command to 'stand still' cannot suddenly become transformed into a case of 'indicated child abuse' because of the child's disobedience of—and physical resistance to—the punishment that the parent has a right to impose." In her dissenting opinion, Judge Eyler stated:

It was not unreasonable for the appellant to use some form of corporal punishment—that is, spanking—given the severity of the misbehavior. It is the appellant's use of a leather belt with buckle as a punishment device under the existing circumstances that is at issue.

\*     \*     \*

The appellant's disciplinary actions in this case were taken in a chaotic set of circumstances involving a young and immature child that made it substantially likely that the child would be physically harmed; and indeed the child was physically harmed.... In my view, because the punishment was carried out in circumstances where it was evident that the child was too young and immature to submit and was likely to be harmed, and in fact was harmed, the punishment was objectively unreasonable and met the definition of "indicated child abuse."

issue of whether the punishment would produce such an injury.[6]

Applying these principles to the ALJ's factual findings in the case at bar,[7] we begin with the *Taylor* Court's "threshold question," which requires a determination of "whether the act causing injury to [appellee's] child was done with an intent to injure or was done recklessly and injury resulted." A review of the record makes it clear that appellee did not swing at the back of her son's head (1) with intent to injure him,[8] or (2) with knowledge that the likely result of her action would be an injury "[t]he nature, extent, and location of [which] indicate

---

6. It is true, of course, that *Taylor* involved an injury to the child as a result of the parent's temper tantrum rather than as a result of the parent's considered decision to impose a particular type of corporal punishment. That does not mean, however, that *Taylor* has no bearing on the issues presented in the case at bar. Mr. Taylor intended to kick the stool, and if he did so with reckless indifference to whether that act would result in the child's injury, then he committed an act of "indicated child abuse."

7. As Judge Moylan stated in his dissenting opinion:
   The first-level facts in this case are not really in dispute. The testimony fully supported the ALJ's factual findings:
   4. On April 2, 2003, Alexander made a "smart mouthed" remark to his mother.
   5. The Appellant told him not to talk to her like that and tried to hit her son in the head with her hand bent in a semi-closed position. Alexander turned his head and the Appellant hit him in the eye with her knuckles, causing a two inch by one inch bruise to his left eyelid that was visible two days later.
   The record, however, also compels a finding (not mentioned by the ALJ or by Judge Moylan) that appellee intended to strike **the back** of her son's head.

8. We disagree with the proposition that (in the words of Judge Moylan's dissenting opinion), "[t]he only intent that mattered was an intent to hit the child in the head, not some further intent to hit the child in the head so as to cause a two-inch bruise beneath the eye." As the circuit court stated, the case at bar involves "a relatively innocuous act by the [appellee] where she was trying to pop ... [her son] on the back of the head with a knuckle[, using] [t]he back of her hand. And unfortunately, as that was happening the child turned his head[, resulting in] an untoward and unpredictable result." Under these circumstances, we agree entirely with the circuit court that "[t]he ALJ [came] to a conclusion that ... fails to give any recognition to the fact that the result was not the sort of logical outcome of the act."

that the child's health or welfare was harmed or was at substantial risk of harm," or (3) with reckless indifference to the issue of whether her action would cause such an injury. We therefore agree with the circuit court that appellee's conduct on the occasion at issue did not constitute "indicated child abuse."

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**

Concurring Opinion by DAVIS, J.

Dissenting Opinion by MOYLAN, J.

Dissenting Opinion by EYLER, DEBORAH S., J.

Concurring Opinion by DAVIS, J. in which ADKINS, KRAUSER, WOODWARD, THIEME, JJ. join.

The question as framed before this Court, by appellant, Department of Human Resources, Anne Arundel County Department of Social Services is, "Did substantial evidence support the ALJ's findings that Mrs. Howard struck her son in the eye, leaving a two-inch bruise, and that the incident constituted 'indicated child abuse?' " More specifically, it posits, "When, as here, a parent deliberately strikes her child, and the child both sustains injury and is harmed or placed at substantial risk of harm, the law provides for a finding of 'indicated child abuse'. . . ." The majority opinion enunciates four benchmark principles distilled from *Charles County Dep't of Social Services v. Vann*, 382 Md. 286, 855 A.2d 313 (2004) and *Taylor v. Harford County Dep't of Social Services*, 384 Md. 213, 862 A.2d 1026 (2004), concluding that it is the child's health or welfare that must be harmed, based on the nature, extent and location of the injury, rather than simply harm to the child.

The majority premises these benchmark principles, in part, on the salient observations excerpted from *Taylor* to the effect that the threshold question, in that case, was whether the act causing injury to a child was done with intent to injure or was done recklessly and injury resulted and, referring to what

amounts to strict liability for intentional acts which result in harm to the child, that it was doubtful that either § 5–701 of the Family Law Article or COMAR 07.02.07.12 intends for such a draconian standard to attach. Finally, the majority quotes the *Taylor* Court's characterization of the wording of COMAR 07.02.07.12C(2)(a)(i) as "unfortunate." We are tasked, on this appeal, with answering the above quoted question raised by appellant. The majority opinion, in my judgment, within the constraints of the COMAR regulation requiring that the basis of the finding be the nature, extent and location of the injury, fully and completely addresses the issue as it should have been framed in considering the question of harm or risk of harm to the child's health and welfare, rather than simply whether the child sustained an injury and was harmed, as the issue was framed by appellant.

Although content that our review has been deftly, fully and adequately discharged by the majority opinion, I write separately because I believe the particular—but not peculiar—facts in this case raise issues regarding the articulation as well as the implementation of the child abuse statute and pertinent regulations.

## I

## HARM CAUSED BY UNINTENDED ACT

The majority accurately represents, in its fourth benchmark principle, that *Taylor* holds that an indicated finding is appropriate "when the parent intended to cause such an injury." While we are constrained by what *Taylor* refers to as the "unfortunate" wording of the COMAR regulation, I perceive no difference between application of the holding in *Taylor,* which admittedly involved an intentional act not directed at the child and an act, not patently reckless, where the consequences of the act are not intended by the caregiver. The specific language, quoted from *Taylor* by the majority, which I believe applies with equal force to the facts of this case, is, "We hold that, under the circumstances here present, the intentional act must be shown to have been either reckless in

its nature or deliberately intended to harm the child in order for a finding of 'indicated child abuse.' " [9]

Notably, child welfare investigator, Clare Poussard, testified on cross-examination before the administrative law judge regarding the nature of the incident at issue:

Q. So, you do believe it was an accident that Alex got eventually hit in the eye?

A. Eventually, yes.

Q. Okay. And when Alex told you that it was an accident, did you believe him?

A. (No response)

Q. You testified that Alex told you and it's also in your report that Alex told you, I think it was on 4/4, **Alex stated that his mother hit him but he said it was accidental?**

A. Yes, I was told that.

Q. **Did you believe him?**

A. **Yes.**

At a later point in the proceedings before the ALJ, Ms. Poussard acknowledged the lack of a uniform policy regarding the acts which warrant a finding of indicated child abuse:

JUDGE: *So, when you answered that there really are no guidelines, you meant there really are no guidelines? I mean, in that Ms. McClintick was attempting to get guidelines, there really are not guidelines? Is that correct to say that you're going to assess a case individually and decide that case—*

WITNESS: *Yes, yes.*

JUDGE: And so in one case the fact that it was the head might or might not influence you, in another case the fact that there was an injury might or might not—

WITNESS: Yes, case specific.

---

9. The plain language of this holding in no way precludes a finding of child abuse when the act is deemed to be reckless and all other elements are present.

JUDGE: So, when you answered on redirect, and this is what you said on redirect, you basically said in response to Ms. Light's question that the child was injured in the course of physical discipline and, therefore, it was indicated child abuse. Do you still stand by that statement?

WITNESS: Yes, because I think that it's still all the same thing. And when she hit him in the head during physical—

\* \* \*

WITNESS: Correct. No, it would have to be case specific.

JUDGE: So, you're basically retracting what you said on redirect?

WITNESS: I guess, I mean, at this point—

On re-cross examination, Poussard answered in the negative when asked:

Q. Let's assume that *you were aware of the fact that appellee slapped Alex in the head with her knuckles but she didn't leave any mark,* and you were investigating this incident because maybe you were present with Alex, *would you find child abuse indicated based on these facts?*

A. *No.*

Notwithstanding the acknowledgment by the child welfare investigator that she believed the incident was an accident, as undisputed by anyone involved in these proceedings, the following colloquy at oral argument before this Court sitting *in banc* is most telling:

[THE COURT]: Ms. Barnes, I know you're almost out of time, but I'm hung up on a sentence in your supplemental memorandum that seems to me to support the other side and after quoting the COMAR provision about ruling out child abuse if the act causing the injury was accidental or unintentional, you say "This regulation as the Court of Appeals noted was promulgated to reflect legislative intent that a parent not be labeled a child abuser as a result of unintentionally harming a child."

[APPELLANT'S COUNSEL]: Correct.

[THE COURT]: And isn't the evidence in this case undisputed that Ms. Howard unintentionally injured the child?

[APPELLANT'S COUNSEL]: I don't believe so. I believe she intentionally struck the child to cause discomfort and pain. What distinguishes this very clearly from the *Taylor* scenario and from that regulation and I concede that we inartfully drafted that regulation, was the situation where a parent takes an action and has no intention of even making contact with the child, backing up the car, the hammer, the slamming open the door, the kicking the stool onto the couch. In that situation, if a child were to come onto the scene and be injured, most of us would agree that the legislature never intended that accident to be called child abuse. Outside of that scenario, the agency understood the legislature to be requiring a finding when the elements were satisfied. This is not a situation where the injury was accidental. If I reach over and hit opposing counsel and she says the injury . . .

[THE COURT]: Let me ask you a question, I know you have very limited time. Clarify this for me. But corporal punishment is entirely lawful? Is it not in this State? In other words, what she was doing was lawful as kicking a stool or anything else. Isn't it correct. I mean the act itself was lawful, really we're talking about the consequence of the act. The difference between *Vann*, once you look at it from that perspective, between *Vann* and *Taylor*, both are engaging in what kicking a stool or in administering corporal punishment, both are lawful acts. What moves it beyond lawful, perhaps, or indicated child abuse is the consequences. *Is that correct? And if we're only looking at the consequences, then the consequences are entirely inadvertent, what policy would be served for finding that child abuse? It was a lawful act until the damage was done.* Just like *Vann*, were a lawful act . . .

[APPELLANT'S COUNSEL]: Swinging the belt and then striking the child. Right.

[THE COURT]: No, no, no, swinging at a belt and chasing him around is that in itself, now we all agree that if he's hit in the back of the head, whatever, and there'd been no injury, it wouldn't be child abuse. The act itself was lawful. Corporal punishment.

[APPELLANT'S COUNSEL]: Okay, first Ms. Howard contended that it wasn't corporal punishment, that she simply reacted instinctively. I don't believe that corporal punishment is applicable, but let's suppose that she was trying . . .

[THE COURT]: I have to say that most corporal punishment is usually administered instinctively. We don't give a lot of thought of it, I'm sure in most instances.

[APPELLANT'S COUNSEL]: But let me say that the difference is in reasonableness and although this court might conclude that there's a difference in terms of swinging a belt with a buckle, it is equally reasonable to . . .

[THE COURT]: I know, but I'm trying to figure out what policy you serve when you have an entirely lawful act which could be smacking a child, if you, if we consider and I think it's already been admitted, that had they simply slapped her [sic] in the back of the head, and there'd been no injury, there wouldn't be child abuse. What policy is served by taking an individual and putting them on an indicated child abuse [sic] when the injury itself was entirely inadvertent?

[APPELLANT'S COUNSEL]: I understand the question. Here is the answer. If there was no injury, we don't even get within child abuse so we don't ever look at whether it was reasonable. Once we have the injury, we look at whether the corporal punishment was reasonable corporal punishment. It is only reasonable corporal punishment that is lawful in the State of Maryland. A fact-finder could certainly conclude as, I believe this ALJ did, that when you use the back of your knuckle, you don't even look, you swing at the head and you swing with such substantial force that you leave a bruise one by two inch, you are no longer committing a lawful act. That under the reasonableness analysis, this falls outside the . . . .

[THE COURT]: Let me ask you a question. If you slap the back of the head, with a knuckle, would that have been child abuse, you know, with no injury?

[APPELLANT'S COUNSEL]: With no injury, you're outside of the statutory definition, so we never get to the . . .

[THE COURT]: *Okay, so we get to what would be an accidental injury. The person turned their head. She did not intend to injure her child's eye at all.*

The question presented to the Court of Appeals in *Taylor v. Harford County Dep't of Social Services,* 384 Md. 213, 215, 862 A.2d 1026 (2004), was:

I. Did the Maryland legislature when it adopted [Md.Code (1984, 1999 Repl.Vol., 2004 Supp.), §§ 5–701 *et seq.* of the Family Law Article] and COMAR 07.02.07 *et seq.* intend that an accidental or unintentional injury caused to a child by a parent or caregiver would be considered child abuse?

Appellant argues that the Court's holding that the intentional act must be shown to have been deliberately intended to harm the child applies only to instances in which the caregiver does not intend to strike the child. When queried by a member of this bench about the policy to be served where the caregiver is engaged in a lawful act and the consequences are not only unintended, but also inadvertent, the only answer offered by counsel for appellant was that the injury, without any consideration of the attendant circumstances, warranted a finding of child abuse.

Worthy of reiteration at this point are the following: First, as noted, *supra,* and in the majority opinion, the facts are not disputed by the parties and were simply adopted by the ALJ. Thus, as observed by the majority, the fact-finding of the ALJ was not clearly erroneous, given that there was only one version of what occurred. The most significant of those undisputed facts, as acknowledged by the child welfare investigator and appellate counsel, was that appellee did not intend to strike her son above the eye. The significance therein is demonstrated by the fact that, had that been her intention, unquestionably, her position, at best, would be rendered spuri-

ous. It appears from the proceedings before the ALJ, and judicial and appellate review, that the determination of child abuse, according to appellant's reading of COMAR, is merely a check off procedure, first, of whether there is an injury, then, whether the nature, extent and location of that injury is sufficient to sustain a finding. Where there is a bruise lasting forty-eight hours, a child abuse finding is justified.

The facts, as evidenced by the above excerpts from prior proceedings, I believe, should not support a finding of indicated child abuse where a parent engages in a lawful act, not found to be reckless, and inadvertently causes an unintended injury in the administering of corporal punishment. Although *Taylor* was confined to the facts of that case, I believe the general precept enunciated should also apply to the case at hand.

## II

### HARM OR SUBSTANTIAL RISK OF HARM TO THE CHILD'S HEALTH OR WELFARE

As indicated above, the parties to these proceedings have loosely referred to harm or risk of harm to the child. Family Law Article, § 5–701(b)(1) defines child abuse, however, as physical or mental injury "... under circumstances that indicated that the child's health or welfare is harmed or at substantial risk of being harmed." COMAR 07.02.07.12. After the child welfare investigator indicated that it was the policy of the Department to discourage any "physical discipline," the administrative law judge, seeking clarification as to how appellant adhered to the "health or welfare" component of the statute, engaged in the following colloquy with the child welfare investigator:

JUDGE: I have some questions. Are you saying that any time a child would be injured in the course of the administration of physical discipline by a caretaker you would find that abuse was indicated?

WITNESS: The child would have to be harmed or placed at substantial risk of harm in combination with that.

JUDGE: And what in this case, in particular, convinced you that the child was either harmed or placed at substantial risk of harm?

WITNESS: The bruising to his—the bruising to his eye region and the fact that she went to hit him in the head but it just so happened that her knuckles accidentally caught his eye.

JUDGE: *Okay, when you first began cross examination, [appellant's counsel] asked you if you believed Alex was at risk of harm from his mother, and you said you didn't believe he was at risk of harm from his mother.* Would you clarify that answer to me, since you found. . . .

WITNESS: And correct me if I'm wrong but I believe that I was getting questions on him in the home and why he didn't go—this was on why he didn't go to the doctors because I didn't think—

JUDGE: I want to know why you said that you didn't believe he was at risk of harm from his mother.

WITNESS: But I don't know—why he wasn't at risk of harm from his mother? But I do think that he was injured by his Mom, that's how I got my finding.

JUDGE: That's what [sic] confusing me. If he was injured, why was he not at risk of harm?

WITNESS: I'm not sure what that question was in response to.

JUDGE: All right. When you were being questioned further, you said that you believed that she intended, Ms. Howard intended to cause physical harm because she chose to him [sic] in the head.

WITNESS: Yes.

JUDGE: Then you told her that it was not illegal to use physical discipline but it is illegal to leave a mark. And you told her that it was okay to hit with an open hand. So, is it your statement that if she hit him in the face with an open hand and didn't leave a mark, that would be fine?

WITNESS: *I wouldn't have indicated child abuse. If there wasn't an injury to his face and he was hit in the head*

*with an open hand, I would never have indicated child abuse. There wouldn't have been a current incidence of physical injury to his face.*

JUDGE: Is it more the area in which she hit him or the fact that she left an injury? I'm a little bit confused.

WITNESS: It's both, the combination of the head and the injury. And I think it's a different thing to be struck on your buttocks than it is your head. The risk of harm is significantly greater if you hit a child in the head than it is on their buttocks.

JUDGE: So, it's the area she chose?

WITNESS: Uh-huh.

JUDGE: And the fact that an injury actually occurred, is that what you're saying?

WITNESS: (No audible response.)

JUDGE: If she hit him in the buttocks and left a bruise and he want [sic] to school and complained, showed the guidance counselor, look what my mother did to me, she hit me and left this bruise, would you find it indicated?

WITNESS: If there were indications that the child was in pain, if it hurt for the child to sit down at school and he couldn't concentrate because he had extreme amounts of pain in his rear, then there would have to be something— and depending on how big the bruise was on his buttocks. If this was his entire butt was bruised and he couldn't sit or even if it was a small bruise and still he couldn't sit, it was interfering with him learning.

Counsel for appellant at the *in banc* hearing before this Court was again asked to articulate her interpretation of the "health" or "welfare" component of the statute:

[THE COURT]: How do you define health and welfare?

[APPELLANT'S COUNSEL]: With difficulty, however.

[THE COURT]: I mean, are we just talking about a simple injury?

[APPELLANT'S COUNSEL]: No ...

[THE COURT]: Go ahead.

[APPELLANT'S COUNSEL]: The statute requires injury plus. So, obviously injury does not equate with harm. Harm has to mean something additional and I would say, when you have lingering pain, when you have lingering evidence where the child was, there was any evidence the child couldn't sit still the next day after they were paddled or . . .

[THE COURT]: And you're satisfied that health and welfare can be simply the physical component? **It's nothing more than that, it has nothing to do with the child's well-being or long term well-being, but it's just the physical.**

[APPELLANT'S COUNSEL]: **I believe it can be both. In this case, there was no evidence regarding long term effects, however, there are some children, for example, who are terrified to go home and that would be an emotional reaction.**

[THE COURT]: But health and welfare applies in each and every case.

[APPELLANT'S COUNSEL]: It does and sometimes, that's satisfied by the extent and nature of the injury. Sometimes, that's satisfied simply by the location of the injury. Sometimes, it's by the child's residual psychological effects. It's a poorly worded statute in that sense, but our regulation says, look at the nature extent and location of the injury.

[THE COURT]: So your position is that you can have harm to the health and welfare with nothing more than a physical injury?

[APPELLANT'S COUNSEL]: I believe that's what the statute intended . . .

[THE COURT]: And the harm of the health or welfare could be as short as two minutes. As long as it's there, it's indicated child abuse.

[APPELLANT'S COUNSEL]: The injury . . .

[THE COURT]: It's like a theft case, as soon as the guy moves the screwdriver from the hardware store shelf, he is guilty of theft.

[APPELLANT'S COUNSEL]: Many many ALJs have turned to their dictionary to define harm to health or welfare and I think all we've arrived at this point is that it's something more than the injury, something lingering, something and in the regulations, you look at the nature, extent and location of the injury as it is something more.

[THE COURT]: Well, what do you have more than injury in this case?

[APPELLANT'S COUNSEL]: We have a very delicate area of the body that had a bruise two days later and a swelling a day later.

[THE COURT]: That's the injury, though.

[APPELLANT'S COUNSEL]: And the ALJ concluded that that was also harm because it persisted for two days, but I think more important for this Court's evaluation, any time you strike a child in the facial region and leave such an injury in the eye area, you have exposed that child to a substantial risk of harm.

[THE COURT]: So your position is the injury itself in the appropriate case, the observed injury of some duration supports the finding of harm or risk of harm, substantial risk of harm.

[APPELLANT'S COUNSEL]: Yes, yes.

[THE COURT]: Can there be injury that's simply infliction of pain?

Essentially, the Department relies, as it must, on the nature, extent and location of the injury to establish the health or welfare component. However, the fact that the injury forms the basis for the determination of "health or welfare" does not obviate the requirement to make a determination if indeed the child's health and welfare have actually been harmed.

Regarding the circumstances which resulted in the injury, the manner in which appellee struck her son has been mischaracterized. The child welfare investigator and the ALJ referred to the appellee's administration of a "blow" to the head. Appellee, without contradiction from anyone, including Alex, maintained that she "popped him upside the head." She specifically described her hand as having been open, with her fingers bent slightly simulating a claw. According to appellee, she did not, as has been suggested, lead with her knuckles. As fate would have it, the knuckle made contact with the area above Alex's eye, but her intent was simply to "pop" him with the back of her open hand and extended fingers.

Referring to the manner in which she struck Alex, appellee testified:

Yes but it was the back of my hand so my knuckles did touch him. But it was not a forceful punch or slap. I didn't—and his face was towards me. She said that she thought I intended was [sic] going to hit him in his face. His face was not towards me.

Later in her testimony, appellee described how her hand made contact with Alex: "And I was finishing up, you know, I was going to finish helping him with his question. But when I—flip him like that, and my fingers were open like—but they were bent and—. . . . " After indicating that her hand was open with bent fingers, like a claw shape, she continued:

Yes, but it was the back of my hand so my knuckles did touch him, when it was not a forceful punch or slap. I didn't—and his face turned towards me. She said that she thought I intentionally was going to hit him in his face. His face was not turned towards me.

The American Bar Association Model Penal Code, § 3.08, sets forth the following permissible limits with regard to corporal punishment:

Parent or guardian

To the extent statute identifying justifiable uses of force sets forth defenses to criminal actions, statute permits parent to inflict corporal punishment on child when punish-

ment is for purposes of safeguarding or promoting child's welfare and force used is not designed to cause or known to create substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation. *Miller on Behalf of Walker v. Walker,* Pa.Super.1995, 665 A.2d 1252, 445 Pa.Super. 537. Assault And Battery 64

When applying statute governing justification for use of force on children by parent or guardian, trial court should focus *not only on degree of force exerted by parent,* but also on age and physical and mental condition of child who has been disciplined. *Com. v. Ogin,* Pa.Super.1988, 540 A.2d 549, 373 Pa.Super. 116, appeal denied 557 A.2d 343, 521 Pa. 612, appeal denied 557 A.2d 343, 521 Pa. 611. Assault And Battery 64

Of note, the issue that the Court of Appeals decided in *Vann* was stated as follows:

> In this case, we must decide whether the Court of Special Appeals, on judicial review of an administrative agency decision, erred when it held that a parent could not be responsible for indicated child abuse when, in the course of administering corporal punishment, the parent inadvertently injured his son because the child attempted to escape the punishment. The Charles County Department of Social Services found Charles Vann responsible for "indicated child abuse" pursuant to Maryland Code (1999 Repl.Vol., 2003 Cum.Supp.), § 5–701 of the Family Law Article. An administrative law judge (ALJ) upheld the Department's finding and Vann filed a petition for judicial review of the agency decision in the Circuit Court for Charles County.

*Id.* at 289, 855 A.2d 313.

The narrow question raised, in *Vann,* addressed the decision of this Court premised on the theory that the six-year-old child's furtive attempts to escape his father's flailing attempt to strike him with a belt buckle was an intervening force which caused the injury to the child. The Court discussed at length the concept of "risk of harm," citing the chaotic circumstances of the father wildly swinging the belt buckle at the little child

frantically seeking to escape being struck. Neither the Charles County Department of Social Services, nor appellee, nor the Court, *sua sponte,* raised or considered the issue of whether the circumstances supported a finding that the health or welfare of the six-year-old had been harmed. It is beyond cavil that an isolated egregious incident may suffice to form the basis of a finding that the health and welfare of a child has been harmed. The issue whether the father's actions in *Vann,* in my view, would have established that the child's health and/or welfare were harmed would likely have had merit, given the age of the child and the probable palpable and indelible terror he experienced. Not only are there no circumstances which would support a finding that Alex's health or welfare was harmed during this isolated incident, child welfare investigator Poussard explicitly testified, "In this case, there was no evidence regarding long-term effects . . ."

Significantly, not only does COMAR 07.02.07.12 specifically require that the Department demonstrate harm to the health or welfare of the child to support a finding of child abuse, Section C(2)(b), "Ruled out Child Abuse," provides that a finding is not justified if "The child's health or welfare was not harmed or at substantial risk of being harmed; . . ." and Section B(4), "Unsubstantiated Child Abuse," provides that a finding is not justified if there is "insufficient evidence that the child's health or welfare was harmed or was at substantial risk of being harmed."

Notwithstanding that COMAR 07.02.07.12 A(1)(d) provides that the nature, extent and location must "indicate" that the health or welfare is harmed, § A(1), which delineates when a finding of indicated child abuse is appropriate, requires that credible evidence in support of such a finding not be refuted. In the first instance, no reasonable person could conclude that the injury in question harmed the health and welfare of the minor child. Indeed, there exists no evidence, even considering the nature, extent and location of the injury, of harm to Alex's health or welfare.[10]

---

10. Child Welfare investigator Poussard certainly recognized the nature of harm to the child's health and welfare when she gave an illustration,

Although the terms "substantial risk of harm" and "child's health or welfare" are often conflated, resulting in a determination of the former without consideration of the latter, it is the protection of the health and welfare which the statute addresses. The injury must affect the child's persona or interfere with his or her ability to perform normal functions. Attributing to the terms "health and welfare" their plain meanings,[11] no reasonable person could conclude that young Alex suffered any long term effects as a result of the incident at issue.

Speaking to the nature of an injury, which affects the health and welfare of a child sufficient to sustain a finding of child-abuse, the United States Court of Appeals for the Seventh Circuit, in *Lewis v. Anderson*, 308 F.3d 768, 774 (7th Cir.2002), observed:

> Even though evidence of even a single instance of abuse may constitute a circumstance sufficient to warrant immediate state action on a child's behalf, *see, e.g., Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 22 (1st Cir.2001), *that must be an instance of actual abuse. A single hitting of a child (without more evidence of the severity of the consequences than we have here) does not necessarily constitute child abuse; were that the case, nearly any practitioner or case worker who has ever witnessed a slapping of a child would be under a legal duty to report*

---

"There are some children, for example, who are terrified to go home and that would be an emotional reaction."

11. "Health" is defined as "The state of being sound in mind or body; the condition of an organism with respect to the performance of its vital functions." *Webster's New International Dictionary*, Third Edition. "Welfare" is defined as "the state of faring or doing well; thriving or successful progress in life; state characterized by good fortune, happiness, well-being, or prosperity." *Webster's New International Dictionary*, Third Edition. A "state" is defined as "a mode or condition of being; a condition of mind or temperament." *Webster's New International Dictionary*, Third Edition. "Injury" is defined as "the result of inflicting on a person or a thing something that causes loss, pain, distress or impairment." *Webster's New International Dictionary*, Third Edition.

*the occurrence to the designated agency-and every parent who ever slapped or spanked a child would face the possibility of losing custody of the child. See, e.g., Wis. Stat. § 48.981(2) (making reporting of possible child abuse mandatory for designated persons).* Many states have adopted a *"not every bruise is an abuse"* rule. *See, e.g., Briggs v. State,* 323 Ill.App.3d 612, 257 Ill.Dec. 26, 752 N.E.2d 1206 (2001) ("Beyond the regulation which states not every bruise amounts to abuse, the [Abused and Neglected Child Reporting Act] requires for a finding of abuse death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function, substantial risk of such injury, or corporal punishment which is excessive.") (quotations omitted). While one instance of child-hitting may raise a red flag, it does not immediately become a "suspicion" of child abuse. [Emphasis added.]

Thus, although a single instance of excessive use of force may constitute abuse, the Seventh Circuit, in *Anderson,* requires that the corporal punishment be excessive or result in death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function, or substantial risk of such injury.

At various stages of the proceedings before the ALJ, the Department sought to establish the "health and welfare" component of the statute by merely alluding to the presence, over a two-day period, of the bruise. As previously stated, because of the particular facts of this case, the determination of harm to the child's health and welfare is rendered essential because the act at issue is not patently excessive or egregious. In *Vann,* a chaotic image is conjured up when one contemplates a six-year-old attempting to escape the wild flailing of a belt buckle. The circumstances that supported a finding of substantial risk of harm in that case would also support a finding of harm to the health and welfare of the six-year-old who was, no doubt, terrified and psychologically scarred by the incident.

By contrast, there is not a scintilla of evidence to indicate any detriment to the overall well-being or physical, emotional or psychological state of the minor child in this case. As noted, when asked by members of this Court whether health or well-being can be established with simply the physical component, appellant's counsel conceded, "In this case, there was no evidence regarding long-term effects, however, there are some children, for example, who are terrified to go home and that would be an emotional reaction." This is not only an acknowledgment that counsel for appellant comprehends the nature of the harm requisite to support a finding that the child's health and welfare are harmed, the example of a child fearful of going home because he or she has been traumatized by the caregiver is precisely the type of harm contemplated by the statute. There is nothing in the record to indicate that young Alex is easily intimidated and, in fact, his disrespectful behavior indicates the contrary. In fact, it was elicited, during the hearing before the ALJ, that Alex's greatest passion, at the time of the incident at issue just short of his fourteenth birthday, was football, hardly a past time for a reticent teenager. A measure of how deeply involved he was with the most physical of sports was that his school grades rose sharply during the football season because he was only permitted to play football if he performed well, academically, during the season. The ALJ was obliged to consider the age and physical and mental well-being of the child in a determination of whether the punishment administered affected the child's health and welfare. No consideration was given to these crucial factors by the ALJ in deciding whether a finding of child abuse was indicated. More importantly, appellate counsel, further conceding that the "health and welfare" components apply "in each and every case," has essentially acknowledged that the ALJ's finding of indicated child abuse was not supported by an essential element of the statute. Having made these concessions, counsel's only explanation is, "It's a poorly worded statu ·  in that sense, but our regulation says, look at the nature, extent and location of the injury."

Significantly, the Department and the ALJ rely heavily on the proposition that excessive force was employed while acknowledging that striking Alex on the back of the head would not have been, in contemplation of the statute, proscribed. There is no suggestion that Alex would have sustained any injury had appellee delivered an open-handed, backhand slap on the back of the head with fingers curled like a claw. From the foregoing, because there was no intendment to cause the resultant injury and, because the Department failed to demonstrate any harm to the minor's health or welfare, I wholeheartedly concur with the majority that the finding of indicated child abuse was unwarranted.

Judges ADKINS, KRAUSER, WOODWARD and THIEME have authorized me to say that they join in this concurring opinion.

Dissenting Opinion by MOYLAN, J. in which HOLLANDER, EYLER, JAMES R., KENNEY, EYLER, DEBORAH S., BARBERA, and SHARER, JJ. join.

Respectfully, I dissent. This is a close case and a difficult one. It is easy to sympathize with an exasperated but well-meaning parent. The sanction of being listed as an abuser in the central registry of the Department of Social Services is a harsh one. A strong argument, on the other hand, might be made that striking a child on the head (even the back of the head) is never an acceptable disciplinary modality. Be that as it may, I am not troubled by the *ad hoc* result in this case. Had I been the fact finder, I might well have reached the same result.

I was not the fact finder, however, and thereon hangs my disagreement with the majority opinion. Whatever I think I might have done as a *nisi prius* fact finder should not, in my judgment, play any role whatsoever in how I look at a case through the very different prism of appellate review. What drives this dissent is my concern with the institution of appellate review itself, as it has been my concern repeatedly over three and one-half decades.

The verbal standard under which appellate review rallies is an admirable one. We proclaim extreme deference to all but clearly erroneous *nisi prius* fact-finding. In actual practice, however, we not infrequently short-change that deference whenever we dislike the result being reviewed. Talk about appellate deference, of course, is meaningless when the appellate court likes the result it is affirming. We are profuse in our praise of deference when deference is not needed, but strangely stingy when it might make a difference. The acid test of appellate deference comes only when the appellate court dislikes, perhaps even strongly dislikes, the result below. Only then is deference actually put to the test.

I began this dissent by acknowledging the harshness of the sanction. That harshness is the key to my unease about the majority's decision, unease not just with the opinion but with the undergirding decision of the judges in the majority. I do not believe the majority would have struggled, as it clearly did, to reach its decision if the sanction in this case had been a significantly more lenient one, perhaps nothing more than an admonition not to strike on the head as a disciplinary modality. The stark reality of a harsh sanction, however, should, in my judgment, have no bearing on how we assess the decisional process of the Administrative Law Judge.[12] We are reviewing a process, and that review should not be result-driven.

### Who Is Reviewing Whom?

I fully agree with the majority opinion that "our role in reviewing an administrative agency decision is precisely the same as that of the circuit court." As pointed out for this Court by Judge Wenner in *Martin v. Department of Health,*

---

12. How many times do we tell a jury in a criminal case that it should give no thought to the possible penalty, and that the possible penalty should have no bearing on its verdict. "Physician, heal thyself."

The standard for reviewing the decisional process of how a verdict is arrived at should not shift by so much as a millimeter, regardless of whether the penalty imposed is one of unsupervised probation or capital punishment. That's easy to say, but somehow "between the resolution and the act falls the shadow."

114 Md.App. 520, 525, 691 A.2d 252 (1997), our review is, as the review of the circuit court was, a review of the ALJ's decision itself.

> *"The scope of review on appeal to this Court is essentially the same as the circuit court's scope of review.  We must review the administrative decision itself."* Beeman I, 105 Md.App. at 154, 658 A.2d 1172 (citations omitted).  Judicial review of an ALJ's decision is governed by the provisions of the Administrative Procedure Act (APA), Md.Code (1995 Repl. Volume & 1996 Supp.) § 10–222, State Gov. Art. (SG).

(Emphasis supplied).

### Reviewing the ALJ's Fact–Finding

I further agree with the majority opinion that we accept the findings of fact as made by the ALJ. In *Travers v. Baltimore Police Dept.*, 115 Md.App. 395, 419, 693 A.2d 378 (1997), Judge Harrell well described the "substantial evidence" standard of review that an appellate court will apply to the decision of an ALJ, or to any other administrative tribunal.

> *In reviewing an agency's factual findings, we therefore apply the "substantial evidence" test to the final decisions of an administrative agency.*  Under the substantial evidence standard, *a reviewing court must uphold an agency's determination* if it is rationally supported by the evidence in the record, *even if the reviewing court,* left to its own judgment, *might have reached a different result.*

(Emphasis supplied).

In *Eastern Outdoor Advertising v. Baltimore*, 146 Md.App. 283, 301, 807 A.2d 49 (2002), Judge Hollander further elaborated on the substantial evidence test.

> *Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."*  It means "more than a 'scintilla of evidence,' such that a reasonable person could come to more than one conclusion." In other words, the reviewing court must ask whether "reasoning minds could reach the same conclusion from the facts relied upon by the Board."

> *An agency's factual findings are binding upon a reviewing court, so long as they are supported by substantial evidence* in the record. *A reviewing court may not engage in judicial fact-finding.* "Because of the deference [we must] accord [to] the expertise of an administrative agency acting within the sphere of its regulated activities, *we refrain from making our own independent findings of fact or substituting our judgment for that of the agency when the record contains substantial evidence supporting the agency's determination."* Further, the tasks of drawing inferences from the evidence and resolving conflicts in the evidence are exclusively the function of the agency.

(Emphasis supplied).

The judicial decision that controls our decision in this case is the opinion of Judge Raker for the Court of Appeals in *Charles County v. Vann,* 382 Md. 286, 855 A.2d 313 (2004). That case also involved *a finding* by an ALJ *that a parent was responsible for indicated child abuse* in connection with the administration of corporal punishment to a six-year-old child. That was more than a finding of a first-level fact. That was the finding of an ultimate or conclusory fact. Judge Raker described the deference owed by a reviewing court to the factual findings of an ALJ.

> With regard to agency factual determinations, the standard of review is whether the finding is "unsupported by competent, material, and substantial evidence in light of the entire record as submitted," also known as substantial evidence review. SG § 10–222(h)(3)(v). *Under substantial evidence review* of an agency's factual findings, *a court is limited to ascertaining whether a reasoning mind could have reached the same factual conclusions reached by the agency on the record before it.*

*Id.* at 295, 855 A.2d 313 (emphasis supplied). On a close question, which this case presents, a reviewing court could readily reach one conclusion, but yet have to concede that "a reasoning mind" could have reached a different conclusion.

The first-level facts in this case are not really in dispute. The testimony fully supported the ALJ's factual findings:

4.  On April 2, 2003, Alexander made a "smart mouthed" remark to his mother.

5.  The Appellant told him not to talk to her like that and tried to hit her son in the head with her hand bent in a semi-closed position. Alexander turned his head and the Appellant hit him in the eye with her knuckles, causing a two inch by one inch bruise to his left eyelid that was visible two days later.

### Reviewing Mixed Questions of Law and Fact

In concluding its discussion of the standard of appellate review, the majority opinion states as follows:

In the case at bar, we accept all of the Administrative Law Judge's factual findings. *On the other hand, "when reviewing issues of law, ... the court's review is expansive and it substitutes its judgment for that of the agency." Curry[ v. Dept. of Public Safety and Correctional Services]*, 102 Md.App. [620]at 627 [651 A.2d 390 (1994)]; *Columbia Rd. Citizens' Ass'n v. Montgomery County*, 98 Md.App. 695, 698, 635 A.2d 30 (1994). For the reasons that follow, we conclude that the facts found by the ALJ do not support *the conclusion of law that appellee committed an act of "indicated child abuse."*

(Emphasis supplied).

In my opinion, the majority, in leaping adroitly from A to C, has passed over the very pertinent land of B. The review of fact-finding (A) is deferential. The review of legal rulings (C) is not at all deferential.[13] In my opinion, the application of the law to a set of undisputed facts is a mixed question of law and fact (B), rather than a question of pure fact or one of pure law.

---

**13.** Both *Curry v. Department* and *Columbia Road Citizens Assoc. v. Montgomery County,* cited by the majority opinion as authority for less deferential review, involved clearly legal questions of statutory interpretation.

Whether the first-level facts add up to an ultimate or conclusory fact is a classic mixed question of law and fact.

The dispute in this case is not over what happened, but over the significance of what happened. Maryland Code, Family Law Article, § 5–701(b) defines "abuse."

(b) *Abuse*—"Abuse" means:

(1) *the physical* or mental *injury of a child by any parent* or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, *under circumstances that indicate that the child's health* or welfare *is harmed* or at substantial risk of being harmed.

(Emphasis supplied). Section 5–701(m) goes on to spell out that a finding of abuse is "indicated" whenever "there is credible evidence, which has not been satisfactorily refuted, that abuse . . . did occur."

COMAR 07.02.07.12 specifies the criteria for the disposition of investigations of suspected child abuse as follows:

A. Indicated Child Abuse.

(1) Physical Abuse Other than Mental Injury. Except as provided in § A(3) of this regulation, *a finding of indicated child physical abuse is appropriate if there is credible evidence,* which has not been satisfactorily refuted, *that the following four elements are present:*

(a) *A current* or prior *physical injury;*

(b) *The injury was caused by a parent,* caretaker, or household or family member;

(c) *The alleged victim was a child* at the time of the incident; and

(d) *The nature, extent, and location of the injury indicate that the child's health* or welfare *was harmed* or was at substantial risk of harm.

(Emphasis supplied).

The only issue in dispute in this case would seem to be whether the injury immediately above Alexander's eye would qualify as "harm." It is a case of a deliberately inflicted blow

causing an unanticipated harm. Even if this is deemed to be not a pure question of fact but a mixed question of law and fact, *Charles County v. Vann*, 382 Md. at 296, 855 A.2d 313, made it very clear that a reviewing court extends the same deference to the ALJ on such mixed questions as it does on pure questions of fact.

> *When the* agency *decision being* judicially *reviewed is a mixed question of law and fact, the reviewing court applies* the substantial evidence test, that is, *the same standard of review it would apply to an agency factual finding.*

(Emphasis supplied).

In *Charles County v. Vann,* as in this case, the ALJ had found that a parent was responsible for indicated child abuse when, in the course of administering corporal punishment, the parent inadvertently injured the child because the child attempted to escape the punishment. 382 Md. at 289, 855 A.2d 313. In the *Vann* case, a six-year-old son had badly misbehaved at school. The misbehavior, moreover, was a regular occurrence. Various disciplinary steps taken by the parents had proved to be unavailing and the parents decided to apply corporal punishment. Judge Raker, *id.* at 290, 855 A.2d 313, described the critical incident:

> Both parents agreed that corporal punishment was the appropriate discipline for their son's misbehavior that day. *Using his personal belt, respondent, while verbally chastising his son for the incident at the daycare center, struck at his son.* But *the six-year-old attempted to avoid the blows* by running away, hiding under the bed, and grabbing the belt from his father. *In the course of the tussle* and respondent's attempts to land the blows, *respondent struck him in his lower back with the belt buckle, causing a reddish, moon-shaped bruise about an inch in length.*

(Emphasis supplied).

After the Department of Social Services found "indicated child abuse," Vann exercised his right to a hearing before an ALJ. The ALJ found "admirable" the fact that Vann "loves his son ... fiercely and wants to raise well-behaved responsible

children." The ALJ also found that although Vann "testified that he was aiming for [his son's] buttocks, he missed the mark and hit the lower-mid back area, leaving marks." *Id.* at 291, 855 A.2d 313. . With respect to the bruising in that case, the ALJ concluded that "[s]triking him and causing a half-moon red/purplish mark on his back ... harmed his health and placed him at substantial risk of harm." The ALJ's ruling concluded:

> The substantial risk and potential for such harm was imminent in that if the child had ducked to avoid the belt, the buckle could have struck his eye or teeth, and could have resulted in more serious, even permanent, injuries. *Once an intended target becomes a moving one, it cannot be predicted with certainty where the blows will land.*

*Id.* at 291–92, 855 A.2d 313.

After the circuit court affirmed the decision of the ALJ, this Court, in an unreported opinion, reversed.

The Court of Special Appeals reasoned that, as a matter of law, respondent's exercise of corporal punishment could not be "transformed" from lawful corporal punishment into unlawful indicated child abuse simply by virtue of the child's disobedience to his parent's order to stand still and accept the punishment. But for the child's independent decision to disobey, the court stated, the punishment would have been lawful, and a parent cannot be held responsible for the injury if the child's action is the "independent intervening cause" of the injury.

*Id.* at 292, 855 A.2d 313. This Court, on that occasion, treated the ALJ's decision to be a decision on a matter of law. Judge Deborah Eyler dissented from that decision, and her dissent ultimately saw the light of day in the subsequent opinion of the Court of Appeals.

The Court of Appeals reversed this Court and reinstated the decision of the ALJ. It held that we were wrong in deeming the ALJ's conclusion to be one of law. It held that the question was a mixed one of law and fact.

> *We disagree that the issue is solely a legal one. Whether a finding of "indicated child abuse" is permitted* by FL

§ 5–701 when, in the course of administering corporal punishment, the child disobeys the parent and consequently is injured *is patently a mixed question of law and fact.*
*Id.* at 297, 855 A.2d 313 (emphasis supplied).

As such, the Court of Appeals went on to hold, the ALJ's decision was entitled to the more deferential standard of review.

[T]he agency determination—here, that a substantial risk of harm resulted from respondent's swinging of a belt buckle at a six-year old attempting to evade the blows—was an application of law to a specific set of facts. *The ALJ's decision was entitled to deferential review, that is, substantial evidence review,* and *the court should have considered whether the ALJ's application of law to the facts was fairly debatable or whether a reasoning mind could have reached the same conclusions reached by the agency* on the record before it.

*Deferential review over mixed questions of law and fact is appropriate* in order for the agency to fulfill its mandate and exercise its expertise. *Administering a child abuse statute is the sort of action for which the expertise of agencies is well suited.*
*Id.* at 298, 855 A.2d 313 (emphasis supplied).

Judge Raker's opinion also pointed out that in such child abuse cases, the agency's determination is much to be preferred over a judicial determination.

Because of the fact-dependent nature of such inquiries, *it is more desirable for the agency,* using its expertise and scrutinizing the evidence before it, *to determine whether the risk created by the parent satisfied the child abuse statute.* Accordingly, *the agency's application of the law must be given deference under the substantial evidence test.*
*Id.* at 299, 855 A.2d 313 (emphasis supplied).

Employing the deferential substantial evidence standard, the Court of Appeals concluded that the ALJ's decision "was not unreasonable."

*Applying the substantial evidence test, this Court must assess whether a reasoning mind could have reached the*

*conclusion,* based upon this record, that respondent's actions created a substantial risk of harm toward his son. The ALJ's considered judgment was that the swinging of the buckle end of a belt at a six-year old who was attempting to run away *did* create such a risk. *The record substantiates this finding, and it was not unreasonable.*

*Id.* (emphasis supplied).

Quite aside from anything else, *Charles County v. Vann* established that the ALJ decision under review is a mixed question of law and fact and, as such, is entitled to review according to the deferential "substantial evidence" test. The issue in this case is, to be sure, a close one. Under the guidance of *Charles County v. Vann,* that is all the more reason why we should eschew engaging in our own fact-finding and should defer to the judgment of the ALJ just so long as it could be deemed the product of a reasonable mind.

## No Criminal *Mens Rea* Is Involved

I believe that the majority's injection into the discussion of the Criminal Child Abuse Statute, Maryland Code, Criminal Law Article, § 3–601, and of the Comment to Maryland Pattern Jury Instruction–Criminal 4:07 is totally inapposite. The civil provisions of Family Law Article, § 5–701 and of COMAR Regulation 07.02.07.12 are concerned only with the physical consequences of actions that harm or threaten harm to a child's health or welfare. To exonerate the appellee, therefore, of "cruel or inhumane treatment" or of "malicious acts," a state of mind that has never remotely been ascribed to her, serves only to distract attention from what is properly before us.

## Taylor v. Harford County

The majority opinion also ascribes a pivotal significance to the case of *Taylor v. Harford County Department of Social Services,* 384 Md. 213, 862 A.2d 1026 (2004), which, I believe, that case does not warrant. *Taylor* has not, in my judgment, changed the law in the slightest respect. *Taylor,* moreover, has had no modifying effect on *Charles County v. Vann,*

*supra.* Indeed, *Taylor,* for two and one-half pages, 284 Md. at 221–23, 395 A.2d 1174, quotes, with approval, the heart of *Vann's* statement of the controlling law. At no point in the *Taylor* opinion did the Court of Appeals remotely intimate that it was changing the *Vann* analysis in any way. *Taylor* was dealing with a totally different problem from that which was before the Court in *Vann* or which is now before us.

In *Vann,* as in this case, the rebuking parent intentionally struck the child. The degree of resulting trauma to the child in *Vann,* as in this case, was unintended. In that limited sense, the physical consequences of the striking may be said to have been accidental, but the actual application of physical force to the body of the child was, both in *Vann* and in this case, indisputably intentional.

*Taylor,* in diametric contrast, was dealing with a totally different cause-and-effect problem. In *Taylor,* the parent never intentionally applied force to the child who was ultimately injured. The issue in *Taylor* was the strictly legal question of, absent intent, what other state of mind could be deemed the blameworthy equivalent of the intent to inflict force, to wit, with what might be called a constructive intent. *Taylor* involved neither a question of fact nor a mixed question of law and fact, but only the purely legal question of whether 1) foreseeability or 2) recklessness should serve as the blameworthy equivalent of the parent's intention of actually inflicting force on the child.

The present appeal, as briefed before this Court, is predicated solely upon *whether the ALJ,* in his determination as to whether appellant was responsible for indicated child physical abuse, *applied the correct legal standard* in reaching his conclusion that appellant was responsible for the abuse under the applicable statutes and regulations. *It is therefore neither a review of the agency's factual determinations nor can it be said to be a review of a "mixed question of law and fact." It is purely a legal question.*
384 Md. at 223, 862 A.2d 1026 (emphasis supplied).

The cartoonish factual scenario in *Taylor* was worthy of Dagwood Bumstead. A father, napping on the living room

couch, was three times awakened by a demanding child. In exasperation, he kicked a stool. The stool was sitting on the floor on the open side of the couch. The child was on the far side, beyond the couch. The stool, as with a point after touchdown, 1) flew into the air, 2) cleared the couch in a beeline trajectory, and 3) struck and injured the child. The father testified, and everyone accepted as a fact, that he never intended for the stool to hit the child.

The ALJ found that, under all the circumstances, the result was foreseeable. The ALJ ruled legally that foreseeability was the functional equivalent of intentionally striking. In overturning that ruling, the Court of Appeals looked to COMAR 07.02.07.12C(2)(a)(1) for its definition of when child abuse would be "ruled out":

(a) *The alleged abuser was not responsible for the injury for reasons* including, but not limited to, one of the following:

(i) *The act causing the injury was* accidental or unintentional and *not reckless* or deliberate.

384 Md. at 226, 862 A.2d 1026 (emphasis supplied).

Based on that definition, the Court of Appeals held that only recklessness would suffice as the functional equivalent of an intentional striking and that mere foreseeability would not. "In the present case, we have determined that the ALJ's failure to consider ... COMAR 07.02.07.12C(a)(1) to be reversible error." 384 Md. at 231, 862 A.2d 1026.

None of *Taylor's* ensuing discussion of what facts must be present to support a finding of recklessness has any bearing on either the *Vann* case or this case, in both of which the intentional application of force to the body of the child was undisputed. The type of alternative cause-and-effect relationship dealt with by *Taylor* has nothing to do with the very different type of causality dealt with in *Vann* and in the case before us. *Taylor* deals with how to get from "A" to "B." Both this case and *Vann* deal with the very different and essentially automatic step of getting from "B" to "C."

Let us explain. "A" represents the initial application of force by a parent. For present purposes, the application of force itself is an intentional act. The force sets an object in motion. It may be the firing of a bullet, the throwing of a stone, the kicking of a stool, the swinging of a closed fist, the swinging of an open hand. "B" represents the striking of the child by the object thus set in motion. To be blameworthy, the movement from "A" to "B" must have been either intended or, as held by *Taylor*, reckless, to wit, in reckless disregard of the likelihood that "A" could readily produce "B."

*Taylor* dealt exclusively with getting from "A" to "B." If the progress from "A" to "B" is deemed to have been intentional, the case is solved and the parent is potentially blameworthy. If, on the other hand, "A" was not set in motion with the intention of striking "B," then *Taylor* establishes that nothing short of recklessness will suffice to establish equivalent blameworthiness.

In this case, as in *Vann*, there is no such problem. We are already at "B." The parent's belt in *Vann* and the parent's hand in this case were set in motion by the parent with the express intention of reaching "B." What the majority attempts to do is to misapply what *Taylor* says about recklessness, simply as a substitute for intention, to an admittedly intentional striking. It also misapplies the analysis of how to get from "A" to "B" to the completely different phenomenon of getting from "B" to "C."

"C" is the ultimate trauma caused by "B." The ineffectual parental defense in *Vann* and in this case is that the ultimate severity of the harm was unintended and was, therefore, "accidental." Being accidental in that sense, however, is beside the point. The progress from "B" to "C" is a random physiological event, with respect to which neither intention nor recklessness nor even foreseeability is material. The critical issue dealt with by *Taylor* was that of getting from "A" to "B," not that of getting from "B" to "C."

If the belt in *Vann* deliberately hit the child, that is all that matters in terms of legal sufficiency. That it happened to hit

the moving child on the lower back rather than on the buttocks is immaterial. If the hand, clenched or open, hit the head of the child in this case, that is all that matters in terms of legal sufficiency. That it happened to hit the unexpectedly turning head below the eye rather than in the back of the head is immaterial.

*Taylor* did not remotely have before it the issue of getting from "B" to "C" and had absolutely nothing to say about that stage. That *Taylor's* exclusive concern was with getting from "A" to "B" and, even more exclusively, was in the limited context of unintentional movement from "A" to "B" is made very clear by the examples it gives of the results its holding was designed to forestall.

> We consider, for example, a situation that was suggested by appellant's counsel at oral argument in which *a father is swinging a hammer while nailing together pieces of a partition wall and does not notice that his child has walked up behind him. The father swings the hammer backwards and strikes the child in the face, causing significant injury.* Under the ALJ's reading of COMAR 07.02.07.12, because the act of swinging the hammer back before striking a nail was an intentional act and not "accidental or unintentional," and his child was injured because of this intentional act, the father might be found to have committed child physical abuse. *We doubt that* either § 5–701 of the Family Law Article or *COMAR 07.02.07.12 intends for such a draconian strict liability standard always to attach* to the intentional acts of parents or caretakers who unintentionally injure their children.

384 Md. at 231, 862 A.2d 1026 (emphasis supplied).

*Taylor's* use of the phrase "unintended consequences" clearly contemplates "B," and not "C," as the unintended consequence.

Part of the blame may lie with the unfortunate wording of COMAR 07.02.07.12C(2)(a)(i) in that *most acts, whether or not they have unintended consequences, are intentional.* For instance, *if someone pushes a door open without realiz-*

*ing someone is just on the other side, and then the door slams that other person in the face, the act of opening the door cannot be said to have been either accidental or unintentional,* although the injurious consequences of that act may have been just that.

384 Md. at 232, 862 A.2d 1026 (emphasis supplied).

In demonstrating the inappropriateness of relying on foreseeability as an equivalent of intent, *Taylor* once again looked only at the problem of of getting from "A" to "B."

*Another example would be those instances where drivers have run over other persons as they operated vehicles in reverse.* The foreseeability of the drivers' actions would be very relevant in a negligence tort context even though there was no intent to injure. However, under the ALJ's analysis, *if the driver was a parent and the person injured his or her child, the foreseeability standard of negligence would be transmogrified into intent to injure the child* and the parent would forever be branded a child abuser. We do not believe that was the intent of the Legislature.

*Id.* (emphasis supplied).

When *Taylor,* therefore, uses the phrase "intent to injure the child" or "intentional harm," those phrases are used exclusively in the context of contrasting the intentional striking of the child with the unintended or accidental striking of the child. They are not in any way referring to the traumatic consequences of the striking. *Taylor,* in short, has nothing to do with this case and should not enter into our analysis.

The numerous references in the majority opinion to what *Taylor* has to say about recklessness and about "Draconian strict liability" are beside the point. The thrust of *Taylor* was to accept nothing less than the reckless striking of a child as the blameworthy equivalent of the intentional striking of the child. As *Taylor's* illustrative examples make very clear, the stringent requirements circumscribing a finding of recklessness are designed to prevent strict liability for child abuse in such cases as 1) the intentional kicking of the footstool absent an intent for it to hit the child, 2) the intentional backing up of

the car absent the intent to roll over the child, 3) the intentional pushing open of the swinging door absent the intent to hit the child on the far side, 4) the intentional swinging of the hammer absent the intent to hit the unseen child. The "harm" that is being analyzed is the actual hitting of the child, not the physiological consequences of the hitting.

In this case, we have an undisputed hitting of the child by the parent, and *Taylor's* analysis of the very different issue of recklessness is totally inapposite. When Judge Cathell in *Taylor* speaks of "parents ... who unintentionally injure their children," 384 Md. at 231, 862 A.2d 1026, he is speaking of parents who did not even intentionally strike their children. That is not what is before us in this case. With respect to the intentional nature of the hitting, the ALJ found:

> There is no question that *the Appellant intended to hit Alexander in the head in order to stop his rude behavior. By her own admission, hitting him was a deliberate action and not an accident. The fact that* he turned his head and *the Appellant missed her intended target does not* alter her action and *make it accidental or unintentional.*

(Emphasis supplied).

The only intent that mattered was an intent to hit the child in the head, not some further intent to hit the child in the head so as to cause a two-inch bruise beneath the eye. The only intent that was critically missing in *Taylor* was the intent for the footstool to hit the child, not some further intent for the footstool to hit the child so as to cause a bloody nose. *Taylor's* entire intentional/accidental dichotomy is concerned with the movement from "A" to "B," from the application of force by the parent to the impact of the moving object on the child. That the blow received by the child turns out, through some behavioral or physiological happenstance, to have a greater or a lesser traumatic impact, is a circumstance that *Taylor* did not deal with and had absolutely nothing to say about. The intent element goes only to the striking of the blow, not to the harm resulting from the blow.

## The Blow Was Intentional

I finally take issue with the dispositive significance given by the majority to the fact that the appellee had no intent to injure her son. When the *Taylor* analysis contrasts an intentional act and a reckless act, the thing that must be intentional is not the resultant injury *per se* but the striking of the antecedent blow that, foreseeably or unforeseeably, caused the injury. The injury itself is a mere happenstance. The appellee claims that what happened was an accident, but she dilutes too thinly the meaning of the word "accident." The injury to the eye may, indeed, have been unintended, but the blow to the head that caused the injury to the eye was undisputably deliberate. The consequence may have been unintended, but the blow that produced the consequence was intended.

All discussion, moreover, about whether the child's health or welfare "was at substantial risk of harm" is also beside the point in this case. COMAR 07.02.07.12A(1)(d) is in the alternative. It speaks of 1) harm or 2) substantial risk of harm. The two inch by one inch bruise immediately below the eye was harm *per se*. At the very least, the ALJ's conclusion, in applying that statutory provision, that "the nature, extent, and location of the injury indicate that the child's health ... was harmed ...." cannot be held, as a matter of law, to have been clearly erroneous. Any discussion of "substantial risk of harm" is surplusage that is not critical to the analysis in this case.

The majority has, I believe, redrafted the statute with ameliatory amendments in order to avoid what it perceives to be an unduly harsh result. The result it reaches is not a bad result but, in my judgment, it is not our function to immerse ourselves too deeply in a particular result just so long as the adjudicative machinery is operating as it is designed to do. What the ALJ concluded in this case was within the range of possible conclusions available to her. I would not interfere with the process.

I am authorized to say that Judge HOLLANDER, Judge DEBORAH EYLER, Judge KENNEY, Judge JAMES EY-

LER, Judge BARBERA, and Judge SHARER join me in this dissenting opinion.

Dissenting Opinion by EYLER, DEBORAH S., J. in which HOLLANDER, KENNEY, and BARBERA, JJ. join.

I am in complete agreement with Judge Moylan's dissenting opinion in this case. Because the ALJ addressed the issue of whether, under the circumstances, the appellee's blow to her son placed him at substantial risk of being harmed, finding that it did, I would add that the record contains substantial evidence to support that finding as well.

The bruising and swelling injury to the tender area around Alexander's eye that persisted for at least two days was substantial evidence that he suffered actual harm to his health. The location, nature, and extent of the physical injury showed that it was not negligible. Moreover, the appellee's act of hitting Alexander in the head without warning, when he was facing away from her and did not know to keep his head still or otherwise protect his face, created a substantial risk of additional, even more serious, harm to his health.

It was fortunate for Alexander that his mother's uncontrolled act of swinging her knuckles at his head only caused bruising and swelling to the area above his left eye. As the ALJ pointed out, but for the happenstance of an inch or two, the exact same blow could have resulted in a serious and permanent injury to Alexander's eye and loss of eyesight. On the evidence presented, reasoning minds reasonably could find that the circumstances in which the appellee swung her knuckles at Alexander's head not only caused him physical injury and harmed his health but also created a substantial but unrealized risk of other, even more serious, physical harm.

The majority emphasizes that, in the definition of child abuse in the domestic violence title of the Family Law Article, the legislature codified the common-law right of a parent to use corporal punishment as a disciplinary method. To be sure, corporal punishment by a parent upon a child is permitted by law in Maryland. It must be reasonable, however; and

corporal punishment that constitutes indicated child physical abuse is not reasonable.

There are ways that parents can spank or physically punish their children that are age appropriate to the child, non-impulsive and controlled, and do not cause physical injury and harm to the child's health or welfare or subject him to a substantial risk of such harm. Here, while the appellee was justified in punishing Alexander for his backtalk, she did so by instantly swinging at his head, forcefully, and with her knuckles, in an uncontrolled situation in which her blow could have hit his face as easily as his head, and could have hit his eye as easily as his eyebrow. The ALJ's conclusion that these facts satisfied either the actual physical harm or the substantial risk of physical harm aspects of the fourth element of child physical abuse was supported by the evidence and should not be second-guessed by this Court.

I am authorized to say that Judge HOLLANDER, Judge KENNEY, and Judge BARBERA join me in this dissent.